FILED

2004 Dec-30  PM 03:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SALVATORE ROSSI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. CV-03-JEO-0505-S |
| | ) | |
| BEST BUT COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION</u>**

This matter is before the court on the motion of the defendant Best Buy Company, Inc. (hereinafter "Best Buy") for summary judgment on the claims of the plaintiff (hereinafter "the plaintiff" or "Rossi").  Upon consideration, the court finds that the motion is due to be granted.

**I.      BACKGROUND**

**A.      Procedural History**

The plaintiff filed his complaint in this case on March 7, 2003.  (Doc. 1).[1]  He alleges he was terminated in violation of Title VII of the Civil Rights Act of 1964, as amended and Title 42,  United States Code, Section 1981.  Specifically, he contends that he was terminated because of his national origin.  Best Buy answered the complaint (doc. 4) and has denied the plaintiff's allegations.  It filed its motion for summary judgment on June 30, 2004.  Included with the motion (doc. 20) was a memorandum of law and evidentiary submissions (doc. 21).  The plaintiff responded to the defendant's motion on July 20, 2004.  (Doc. 23).  The defendant filed a reply to the plaintiff's response on August 4, 2004.  (Doc. 24).

---

[1] References to "Doc. __" are to the documents as numbered by the clerk of court in the court's record of the case.

**B.      Facts**[2]

**1.      Rossi's employment history with Best Buy**

Best Buy hired Rossi on or around July 22, 2001.  (Rossi Dep. at 17).[3]  Prior to working
for Best Buy, Rossi was employed by Lowe's Home Improvement (hereinafter "Lowe's).  (Rossi
Dep. at 18).  Rossi left Lowe's when his general manager, Randall Webb (hereinafter "Webb"),
moved to Best Buy and asked him to move with him.  (*Id*.).  Webb hired Rossi as the appliance
supervisor.  (Rossi Dep. at 19).  As the appliance supervisor, Rossi's duties included, among
other things, meeting sales goals, making sure deliveries were timely, ensuring that the
department was properly staffed, and providing excellent customer service.  (Rossi Dep. at 40).

After Webb left, Best Buy did not immediately fill the general manager's position.
(Rossi Dep. at 34).  During the five to six month time period that the position was vacant, Rossi,
along with several other department managers, helped with the managerial duties.  (Rossi Dep. at
32).  Kevin Bumbalough (hereinafter "Bumbalough"), the general manager that replaced Webb,
testified as follows:

> Q.      But during the period that store didn't have a general manager, the assistant
> managers and supervisors, including Sal Rossi, would take on additional duties to
> help get the store through that period of time; is that correct?
>
> A.      Yes.
>
> Q.      Can you give me some examples of the type of added responsibility that Sal
> would have taken on during that time?

_____

[2] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the
plaintiff.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v.
Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*,
14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3] Excerpts from Rossi's deposition are located at exhibit "A" to document 21 and at document 23 in the court's record.

A.      Here is one duty I have seen him do.  He would help sales lead and he would take on the role of, basically, as sales leader where he would walk around and talk to people about what their numbers were . . .

        . . .

        He did hiring, a lot of hiring for us.  He was our hiring coordinator, and he did a really good job at that.

Q.      Anything else?

A.      He would answer some manager's calls . . . If it was something he could specifically take care of, he would. . . . That is pretty much the example that I have.

Q.      During this period of time when he took on additional responsibilities, was he given access to override codes and things like that that only a manager would normally be privy to?

A.      I don't know. . . . I would think he would have some codes that would enable him to do things that normal hourly associates wouldn't have.

Q.      What about codes and things like that . . . Was he provided anything like that?

A.      I'm sure he was.

Q.      Was he ever provided keys to the store?

A.      I think he was provided limited access keys . . .

Q.      What about keys to lock the store, the front door, the rolling door?

A.      He should not have keys to that.

Q.      Okay.  Generally were supervisors given the keys that Mr. Rossi was provided with?

A.      There is [sic] supposed to be two sale [sic] supervisors in the building that have key controls who actually sign a key waiver agreement that they are responsible for the keys of the building.  They are non-external keys so, yes, there was someone else who could get the keys like Sal.

3

(Bumbalough Dep. at 99-101).[4]  Additionally, Bumbalough testified that after Best Buy got its management staff in place, he would occasionally call on Rossi to be the "go-to person" if he needed help on the management team.  (Bumbalough Dep. at 101).  In addition to Rossi, Bumbalough would call on two other supervisors, Jeremy and Toby, if he needed help with the management team.  (Bumbalough Dep. at 102).

As appliance supervisor, Rossi supervised one full time associate and one part time associate.  Under his supervision, the appliance department was recognized for meeting or exceeding the company's sales expectations.  (Rossi Dep. at 170; Bumbalough Dep. at 127-128).

Rossi received his first Performance Counseling Record (hereinafter "PCR") on March 22, 2002.[5]  (Doc. 21 at Ex. B).  That PCR notes that Rossi used "inappropriate conduct" and was issued a "final warning" as a result.  Specifically, the PCR states:

> On 3/13/02, an issue was brought to the attention of Kevin Bumbalough . . . regarding Sal's inappropriate behavior . . . namely offensive language and behavior . . . it was uncovered Sal did in fact violate Best Buy's policy. Eli Douglass and David Bark reviewed the company guidelines on several occasions with Sal.  Sal acknowledges the direction given by David Bark and Eli Douglasss [sic].  Sal's behavior is a direct violation of Best Buy's policy on inappropriate conduct.  This is a non-tolerance issue and further issues will result in immediate termination. . .

(Doc. 21 at Ex. B).  In the space provided for his comments, Rossi wrote "I will without fail curb my behavior."  (*Id*.).  The PCR is signed by both Rossi and Bumbalough and dated March 22, 2002.

Two weeks later, Rossi received his second PCR.  The second PCR was signed by David

---

[4] Excerpts from Bumbalough's deposition are located at document 21, exhibit "F;" document 23; and document 24, exhibit "B" in the court's record.

[5] The "Counseling Record" states that the issue was brought to Bumbalough's attention on March 13, 2002.  The date of the incident is not specified in the writeup.  (Doc. 21, Ex. B).

Bark, the store sales manager.  In his "written warning" for "falsification of records," Bark cited

Rossi for "initial[ing] on his department DTL that he completed functionality check and updated

his dot.com binder.  Niether [sic] of these items had been complete [sic] by 3:15 p.m."  In the

space provided for his comments, Rossi wrote:

> Having spent 20 hrs hiring employees this week I ran close to overtime.  On 4/6 I
> opened at 9:40 AM and immediately began helping customers.  I processed
> $8,000 in sales by 1 PM when I needed to clock out due to overtime.  That is why
> the DTL was not properly done.  I have however noticed departments in the store
> who don't do anything SOP and they are never written up for it.  We are doing
> well in appliances now and I hope to do so in the future.

(Doc. 21 at Ex. C).  In the space provided for the manager to note the expected change or

improvement in the employee's behavior, David Bark further asserted that "Sal is expected to set

the example in his department.  If he is unable to complete a task on the DTL he needs to assign

[it] to someone else before leaving."[6]  (*Id*.).

Two months later in June, the operations manager, Mark Graf, issued Rossi's third PCR.

(Doc. 21 at Ex. D).  The third PCR was for "violation of rule/policy."  Specifically, Mark Graf

noted that "[f]or the week of 6-2-02 to 6-8-02 Sal Rossi choose [sic] to make his own schedule

after one was provided through the CBS process.  This is unacceptable and an informal

conversation was held on 6-7-02 between myself and Sal."[7]  Graf further noted that "Sal is no

longer going to create his own schedule.  All changes will go through a manager."  (Doc. 21 at

Ex. D).[8]

---

[6] Rossi alleges that he was led to believe that this PCR would not be placed in his file.  (Rossi Dep. at 50).

[7] Rossi alleges that Graf was simply unaware that all of the supervisors had been altering their schedules and that once he explained the situation to Graf, Graf informally discussed it with him and asked him to no longer change his schedule.  (Rossi Dep. at 54).

[8] This PCR is not signed by Rossi.

The next month, Sal received his final PCR.  On July 23, 2002, Bumbalough recorded that "[o]n 7-21-02 Sal worked past his ending shift of 5:30 pm until* 6:29 pm . . . at the time Sal left the building he used a manager override code to punch out,"[9] which was a "violation of rule/policy."  In the space provided for the action taken, Bumbalough checked "termination (must first contact HR)."  (*Id.*).  Rossi refused to sign the final PCR.

Best Buy became aware that Rossi used a manager override code to clock out because another employee, William Ebersoll (hereinafter "Ebersoll"), witnessed the clock out procedure and reported it to Mark Graf.  Specifically, in a statement made by Ebersoll on July 21, 2002, he asserted as follows:

> I, William Ebersoll, told Mark Graf that I witnessed Sal Rossi punch himself out with a manager function.  I then left the building, Sal followed.  He called me to him and asked me what I thought I was doing telling on him.  I told him I did not think it was right and he should not do that.  He proceeded to tell me that if I waited until customers left the parking lot, and he would show me what happens to "Fuck-ups" like me [sic].  I asked him what he planned on doing, he said that if I crossed paths with him again, he would kill me.  I told him I wasn't scared of him and I proceeded to get in my car.  I drove to the front of the store and got out to tell Mark Graf about it.  He pulled next to me and started calling names out at me.  I told him whatever and said "your momma."  And I asked James Noble if he heard anything he said, and he said no.  I then told Mark Graf about this situation.

(Doc. 21 at Ex. G).

Rossi testified that when Graf questioned him about using the management override code, he explained to him that all the supervisors knew and used the codes to clock out.  (Rossi Dep. at 60-61).  After this explanation, Rossi states that Graf told him not to use the code again in the future.  (Rossi Dep. at 61).

---

[9] The "*" denotes that "Sal stayed for the closing meeting as required by the closing manager Mark Graff."

Best Buy policy requires that store managers get approval for terminations from the

human resources manager.  (Williams Aff. at ¶ 4).[10]  Specifically, Reginal Human Resources

Manager Cara Williams testified that

> 4.    . . . The General Manager of a store contacts the HR Manager to recommend
> termination.  The HR Manager typically reviews the circumstances and
> determines whether or not to approve the recommendation to terminate that
> employee.  If the HR Manager approves the recommendation, the HR Manager
> normally contacts the General Manager to communicate that approval.  Once
> Human Resources approves the decision, store management will communicate
> that decision to the employee.  If the employee is a manager, the HR Manager
> normally contacts the District Manager to inform him or her of the decision and to
> inform him or her that a particular store would be losing a manager.
>
> 5.    . . .
>
> 6.    On or around July 23, 2002, I received a telephone call from Kevin
> Bumbalough . . . who was the General manager of the Birmingham store.
> Bumbalough informed me that Rossi had used a manager's override code to clock
> out for the day.  Unauthorized use of an override code, including overriding one's
> own time, is a terminable offense.  Specifically, using an override code to
> override one's own time–as Rossi did–is a more egregious offense than using an
> override code to override another employee's time and Best Buy views these
> actions differently.  Additionally, I understood that Rossi had physically
> threatened William Ebersole, the employee who informed Best Buy's
> management of Rossi's actions.  A threat of physical violence is, without
> question, a violation of Best Buy policy.  In following Best Buy's practice, I
> reviewed Rossi's file and approved the recommendation that terminating his
> employment was the proper action.

(Williams Aff. at ¶¶ 4-6).

On July 23, 2002, Bumbalough gave Rossi his "separation notice."  (Doc. 21 at Ex. H).

In the section provided for employee comments, Rossi wrote:

> It is a common practice for employees to punch in and out using mgr override
> code 9158 when there is no mgr around so to avoid standing around getting payed
> [sic] for no reason. Mark Graf asked me to come back and write a report that day

---

[10]  Cara Williams was the regional human resources manager for Best Buy at the time of Rossi's termination.  Her
affidavit is located at document 21, exhibit "J" in the court's record.

and didn't allow me to fill out a time edit sheet.

(*Id.*). Rossi alleges that Bumbalough told him that Casey was angry at Rossi for making complaints to human resources and that he was the one who made the decision to terminate Rossi's employment. (Doc. 23 at 8 (citing Rossi Dep. at 72 & 74)).[11] Bumbalough, however, testified that not only did he not tell Rossi that Casey was angry with him because of complaints to human resources, but also that he never heard any of the comments or jokes that Rossi alleges Casey and other employees made. Further, Bumbalough testified that he was not aware that Rossi had made complaints to human resources. (Bumbalough Dep. at 118 & 122).

Although Rossi was terminated on July 23, 2002, Casey did not learn of Rossi's termination until July 29, 2002. (Williams Aff. at ¶ 7). Best Buy's normal practice is to communicate the termination of hourly employees to the District Manager at Monday district staff meetings. Accordingly, Williams did not notify Casey of Rossi's termination until Monday, July 29, 2002. (*Id.*).

According to Williams, Casey had no influence on her decision to terminate Rossi and, at the time she made the decision, she was unaware that Rossi had ever made any complaints to the "open line" or to Kelly Arnold.[12] (Williams Aff. at ¶¶ 8-9).

### 2. The alleged discriminatory acts

On January 14, 2002, Rossi first contacted Best Buy's human resources department to complain of discrimination based on his Italian origin. (Rossi Dep. at 158). Thereafter, Rossi

---

[11] A close look at Rossi's deposition shows that he testified that Bumbalough said that he did not agree with the decision and he "had spent the entire day trying to get Tom Casey to reverse this because he felt it wasn't right." (Rossi Dep. at 72). In response, Casey stated that "he had nothing to do with it, as far as he was concerned it was totally out of order." (*Id.*).

[12] Kelly Arnold was the Human Resources Manager for District 18 until June, 2002, when she left the position to become the Human Resources Manager for the Service Center. When Arnold left, Cara Williams took her place. (Doc. 21, ex. J at ¶ 4).

called Best Buy's open line on February 13, 2002, and was told to call Kelly Arnold in human

resources.  (Rossi Dep. at 162).  Then, on April 23, 2002, while in a management staff meeting,

Tom Casey, the district manager referred to Rossi as the "Godfather," and joked that no one else

in the meeting would talk until Rossi had spoken.  (Rossi Dep. at 165).  According to a co-

employee, Toby Cormier (hereinafter "Cormier"), after that meeting, the jokes about Rossi's

national origin became more common.  Specifically, in an affidavit, Cormier testified that:

> 2.    From the very beginning of my time at Best Buy, even during orientation . . .
> employees would make comments regarding Sal being Italian and being the
> godfather of all the employees.  However, it was my feeling that most of these
> comments were made in a positive light.
>
> 3.    However, the nature of the comments regarding Mr. Rossi changed during
> and after a management staff meeting that we attended with Tom Casey, the
> district manager, Kevin Bumbalew [sic], the store manager and Glen Swanson,
> the regional manager.  During this meeting, Mr. Swanson asked all the
> supervisors to ask questions and discuss how the store was being run.  However,
> most of the supervisors were unwilling to ask any questions or make any
> comments.  At that point, Mr. Casey tapped Mr. Swanson on the shoulder , looked
> at Mr. Rossi, and said, in essence, no one is going to talk until the godfather talks.
> I could tell that Mr. Rossi was very upset about this comment.
>
> 4.    At that point, Mr. Rossi asked a few questions and then I asked some
> questions and made some comments and it seemed to open up the whole [sic] so
> that everyone began making comments and asking questions.
>
> 5.    . . .
>
> 6.    It was after the exchange above, following the management meeting, that the
> comments being made by Mr. Casey escalated and became, in my opinion,
> negative in nature.  I overheard Mr. Casey on multiple occasions ask Mr. Rossi,
> "What, no hug gumba?" and call Mr. Rossi "paisano" using an exaggerated New
> Jersey accent.  Mr. Casey would also approach Mr. Rossi on numerous occasions
> and would try to hug Mr. Rossi and kiss him on each cheek.  It appeared to me
> that all of these comments and actions were meant to anger or embarrass Mr.
> Rossi.
>
> 7.    Mr. Casey's comments and actions seemed to spread throughout the store so
> that it seemed that everyone, both managers and associates, began talking about

> Mr. Rossi being the godfather and being in the mob and many managers and associates would speak to Mr. Rossi in an exaggerated New Jersey accent.
>
> 8.    In particular, after Mr. Casey began to joke about Mr. Rossi, it seemed to me that many of the managers and associates believed it was alright to make these jokes and comments. In particular, that Mark Graf, the operations manager, began making more and more jokes about Mr. Rossi's ethnicity and accent.

(Cormier Affidavit at ¶¶ 2-8;[13] *see generally* Noles Affidavit[14]).[15]  Noles also recalls an incident where Casey approached Rossi and asked "how is the godfather doing today?" in a fake New Jersey accent. (Noles Aff. at ¶ 3).[16]

On June 4, 2002, Rossi again called Kelly Arnold and told her that "Casey ignored [him] when he came to the store and that he was - - you know, [he] felt like there was something on [Casey's] mind with [him]." (Rossi Dep. at 168).[17]  Rossi alleges that by June 11, 2002, he felt like Best Buy was trying to find a way to terminate him based on the way he was being treated. (Rossi Dep. at 169).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to

---

[13] Cormier's affidavit is located at document 21, Exhibit "I" and at document 23 in the court's record.

[14] Noles' affidavit is located at document 21, exhibit "K" and at document 23 in the court's record.

[15] Noles' affidavit is substantially similar to Cormier's. However, her memory of the management staff meeting is somewhat different from Cormier's. Noles recalls that in the meeting, she and Cormier were allowing Rossi to ask the questions and Casey commented that "you are like the Godfather, no questions unless you ask them." (Noles Aff. at ¶ 2).

[16] Although the plaintiff does not mention it in his brief, the defendant points out that in deposition, the plaintiff also alleges that (1) an unnamed Best Buy employee from Athens, Georgia stated to Rossi that "[he] must be the mob guy" and then asked how much it would cost . . . to get somebody hit" (Rossi Dep. at 79) and (2) Casey called Rossi and stated that he wanted to come to Birmingham and "break bread" and "have a sit-down like Italians do." (Rossi Dep. at 133).

[17] Presumably, Rossi spoke with Kelly Arnold on other occasions, too. However, as neither party provided the court with Rossi's entire deposition transcript, and the plaintiff has not set out the other instances in his opposition, those instances, if any, and their subject matter, are not before the court.

interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof.  *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings.  (*Id.*).

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are

11

irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III.   DISCUSSION

### A.   National Origin Discrimination Under Title VII

To get past summary judgment, the plaintiff must present a genuine issue of material fact on his discrimination claim. The plaintiff may establish a genuine issue of material fact through either direct evidence of discrimination or through "circumstantial evidence sufficient to allow an *inference* of discrimination." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (italics in original).[18]

### 1.   Direct Evidence

Rossi first alleges that Casey's comments are direct evidence of discrimination. Specifically, the plaintiff alleges that he "has presented substantial evidence to demonstrate that the comments made by Mr. Casey and numerous other employees and managers were blatantly discriminatory and intended to humiliate Mr. Rossi. (Doc. 23 at 14).

Direct evidence of discrimination is evidence, that, "'if believed, would prove the existence of a fact in issue without inference or presumption.'" *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (citing *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (citing Black's Law Dictionary 413 (5th Ed. 1979))). Direct

---

[18] The analytical framework for proving intentional discrimination in a § 1981 case is the same as that applied in Title VII cases. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

evidence relates to an employer's statements "reflecting a discriminatory . . . attitude correlating to the discrimination . . . complained of by the employee." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999), *cert. denied*, 529 U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000). "'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [national origin], . . . constitute direct evidence of discrimination.'" *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).[19]

---

[19] In *Merritt v. Dillard Paper Co.,* 120 F.3d 1181 (11th Cir. 1997), the Eleventh Circuit extensively discussed direct evidence. The court stated as follows:

We have defined direct evidence as "evidence, which if believed, proves existence of fact in issue without inference or presumption." *Rollins v. TechSouth, Inc*., 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (citation, emphasis, and brackets omitted). Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp*., 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby County Bd. of Educ*., 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence. In a long line of cases, this Court has found direct evidence where "actions or statements of an employer reflect[ ] a discriminatory or retaliation attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990). *See Haynes v. W.C. Caye & Co., Inc*., 52 F.3d 928, 930 (11th Cir. 1995) (holding that statement questioning whether a "sweet little old lady could get tough enough" to do the job and statement that "a woman was not competent enough to do this job" constitute direct evidence); *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1518 (11th Cir. 1990) (holding that statement that "no woman would be named to a B scheduled job" constitutes direct evidence); *Caban-Wheeler*, 904 F.2d at 1555 (holding that defendant's statement that program needed a black director constitutes direct evidence); *E.E.O.C. v. Alton Packaging Corp*., 901 F.2d 920, 923 (11th Cir. 1990) (holding that general manager's statement that "if it was his company, he wouldn't hire any black people" and production manager's statement that "you people can't do a ---- thing right" constitute direct evidence); *E.E.O.C. v. Beverage Canners, Inc*., 897 F.2d 1067, 1068 n.3, 1072 (11th Cir. 1990) (holding that plant manager's constant barrage of racial slurs and statements such as "[t]hose niggers out there will not get anywhere in this company" constitute direct evidence); *Sennello v. Reserve Life Ins. Co*., 872 F.2d 393, 394, 395 (11th Cir. 1989) (holding that statement that "we can't have women in management" constitutes direct evidence); *Walters v. City of Atlanta*, 803 F.2d 1135, 1141-42 (11th Cir. 1986) (holding that memorandum requesting a new list of candidates because "current register . . . does not include any minority group representation" constitutes direct evidence); *Wilson v. City of Aliceville*, 779 F.2d 631, 633, 636 (11th Cir. 1986) (holding that mayor's statement that "he wasn't gonna let no Federal government make him hire no god-dam nigger" constitutes direct evidence); *Thompkins v. Morris Brown College*, 752 F.2d 558, 561, 563 (11th Cir. 1985) (holding that college president's statement that he saw no reason for a woman to have a second job and statement that males had families and needs that female plaintiff did not [sic] constitute direct evidence); *Miles v. M.N.C. Corp*., 750 F.2d 867, 874-75 (11th Cir. 1985) (holding that plant manager's statement that he wouldn't hire blacks because "[h]alf of them weren't worth a shit" constitutes direct evidence); *Bell v. Birmingham Linen Serv*., 715 F.2d 1552, 1553, 1557 (11th Cir. 1983) (holding that supervisor's statement that he would not put a woman in a washerman position because "every woman in the plant would want to go into the washroom" constitutes direct evidence); *but see Harris*, 99 F.3d at 1082, 1083 n.2 (holding that statement that "under the circumstances we did not need to employ a black at Thompson High School" open to more than one interpretation and thus not direct evidence).

If the plaintiff is able to establish his case by direct evidence of intentional national origin discrimination, then "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 961-62 (11th Cir. 1997) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S. Ct. 1775, 1795, 104 L. Ed. 2d 268 (1989)). *See also Wall v. Trust Co. of Georgia*, 946 F.2d 805, 809 (11th Cir. 1991) ("defendant's burden to rebut that evidence is to prove by a preponderance of the evidence that it would have made the same employment decision in the absence of discriminatory motivation") (citing *Hill v. Metro. Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1539 (11th Cir. 1998); *Wilson v. City of Albertville*, 779 F.2d 631, 634 (11th Cir. 1986); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir. 1983), *cert. denied*, 467 U.S. 1204, 104 S. Ct. 2385, L. Ed. 2d 344 (1984); and *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 774-76 (11th Cir. 1982).

The plaintiff alleges that Casey's comments referring to him as the "godfather," "gumba," and "paisano" in an exaggerated New Jersey accent are direct evidence of discrimination.  (Doc. 23 at 14-15).  At the outset, the court finds that Casey's alleged comments cannot be direct evidence of discrimination because there is no evidence before the court that Casey was involved in the decision to terminate Rossi.  *See Evans*, 131 F.3d at 962 (finding discriminatory statement by nondecisionmaker inadequate to satisfy plaintiff's burden of

---

As we have explained in the age discrimination context, the quintessential example of direct evidence would be "a management memorandum saying, 'Fire Earley--he is too old.'" *Earley*, 907 F.2d at 1081; *see also, e.g., Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (giving virtually identical example).

*Merritt*, 120 F.3d at 1189-90.

establishing direct evidence of discrimination) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 109 S. Ct. 1775, 1804-05, 104 L. Ed. 2d 268 (1989)).

Although the plaintiff contends that Casey was indirectly involved in the decision-making process, the defendant argues that his (the plaintiff's) assertion and the statements of Cormier and Noles, without more, are insufficient to establish that Casey was involved in the decision-making process.  The defendant further argues that although Cormier and Noble attest that Bumbalough told them that Casey called for Rossi's termination and that Casey made his decision because Rossi complained to human resources about Casey's Italian comments and jokes, their attestations amount to nothing more than pure hearsay that is entirely unsupported by the evidence.  (Doc. 21 at 13).

The fact that evidence is based on hearsay does not necessarily make that evidence inadequate to defeat a motion for summary judgment; instead, it must be inadmissible hearsay that could not be "reducible to admissible form at trial."  *See Pritchard v. Southern Co. Services*, 92 F.3d 1130 (11th Cir.), *amended on reh'g on other grounds*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S. Ct. 2453, 138 L. Ed. 2d 211 (1997).  The plaintiff argues that Cormier and Noles' statements of what Bumbalough said and what Bumbalough said Casey said are admissible because they are statements of the defendant's agents who were acting within the scope of their employment.  FED. R. EVID. 801(d)(2)(D).

Although Bumbalough directly refutes this testimony in his deposition, the court must accept the testimony at this juncture.  Additionally, the court finds that it is arguable that the statements of Bumbalough and Casey related to the reason for the termination are non-hearsay statements under Rule 801(d)(2)(D).  However, the unequivocal testimony is that the decision to

terminate Rossi was made by Williams, acting as the human resources representative.  Therefore, Casey's purported statements related to the reason for the termination are not consequential premised on the relevant issues in this case because he was not a "decisionmaker."[20]

Even had Casey been a decisionmaker, the court cannot find that Casey's comments related to the plaintiff's national origin were of the type that would constitute direct evidence. As stated previously, Eleventh Circuit case law is very clear that "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [national origin], . . . constitute direct evidence of discrimination.'"  *Earley*, 907 F.2d at 1081.  In sum, the court cannot find that the foregoing remarks related to his national origin are direct evidence.

## 2.    Circumstantial Evidence

Because the plaintiff does not present any direct evidence of discrimination, the court must apply the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed. 2d 668 (1973), standard.  The plaintiff must demonstrate "intentional discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  The Supreme Court has stated unequivocally that "[p]roof of discriminatory motive is critical" in a disparate treatment case.  *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 n.15, 97 S.Ct. 1843, 52 L. Ed. 2d 396 (1977). *See also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed. 2d 403 (1983); *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717

---

[20] The court further finds that the plaintiff has read more into the statements of Cormier and Noles than is actually stated.  For instance, Cormier merely states that after additional prodding, Bumbalough stated that Rossi was terminated because of the call to human resources to complain.  (Cormier Aff. at ¶ 11).  There is nothing to support this conclusory statement and there is no foundation for the same offered in the affidavit.  Similarly, the affidavit of Noles states that approximately two weeks after the termination, Bumbalough told her that Rossi "was fired because of his numerous complaints to human resources." (Noles Aff. at ¶ 8).  There is nothing in the affidavit to support this conclusory allegation or the basis of Bumbalough's knowledge of this purported fact.  This evidence is not sufficient under the circumstances.

F.2d 525, 528-29 (11th Cir. 1983).

The plaintiff carries the initial burden of establishing a *prima facie* case of discrimination.  *McDonnell Douglas Corp.*, 411 U.S. 792.  Under the *McDonnell-Douglas* framework, if the plaintiff establishes a *prima facie* case, a presumption is formed that the defendant discriminated against the plaintiff, and the burden then shifts to the employer to respond with a legitimate, nondiscriminatory reason for its actions. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997 ), *cert denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d (1998) (citing *McDonnell-Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824. Once the defendant articulates a "legitimate, nondiscriminatory reason" for its actions, any presumption of discrimination arising out of the *prima facie* case "drops from the case." *Burdine*, 450 U.S. at 255 n.10; *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742, 125 L. Ed. 407 (1993)  The plaintiff is then afforded an opportunity to demonstrate that the defendant's proffered reason was not the true reason for the employment decision. *Combs*, 106 F.3d at 1528.


"A prima facie case of discriminatory discharge may be established in different ways." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).  For instance, the plaintiff can establish his case by showing: (1) he was qualified and yet was fired and then replaced by someone outside his class; (2) he was fired when others outside his class with similar qualifications were retained; or, (3) he was fired premised on "differential application of work or disciplinary rules."  *Id*.

The plaintiff's allegations are somewhat mixed between numbers (1) and (3) above.  He contends that not only was he qualified for the position, but that he exceeded the company's

17

expectations and that he was the "go to guy when they were short handed." (Doc. 23 at 16).

Additionally, the plaintiff asserts that:

> [while] Mr. Rossi was terminated for using an override code to clock out . . . other employees who committed more serious offenses were not terminated. In particular, Mr. Bumbalough acknowledged that an employee, Mr. Spatola, was given only a written warning for complaints of sexual harassment and that the conduct of this employee was more severe than Mr. Rossi's use of the override code.

(Doc. 23 at 15-16 & 22).

The defendant concedes that the plaintiff was replaced by someone outside of his class. (Doc. 21 at 9).[21]  The defendant, however, disputes that the plaintiff was qualified to perform his job.  Specifically, the defendant points out that the plaintiff received four PCRs within less than four months. (Doc. 21 at 9).  Additionally, the defendant had information that the plaintiff physically threatened another employee. (*Id*.).  As such, the defendant contends that the plaintiff was not qualified to perform his responsibilities as Appliance Supervisor at a level that met it's expectations. (*Id*.).  In rebuttal, the plaintiff argues that his department's stellar performance proves that he was qualified. (Doc. 23 at 23-24).  However, the defendant asserts that the plaintiff's past performance is not at issue; instead, it is the misconduct leading up to his termination that rendered him unqualified for his position. (Doc. 24 at 6).

Without deciding whether the plaintiff was qualified, the court finds that he is unable to establish a *prima facie* case because he has failed to show that he was fired when others with similar qualifications outside his class were retained.  The only comparator that the plaintiff sets

---

[21] The elements required for the establishment of a prima facie case as set out by the defendant are somewhat different than the analysis undertaken by the court.  The elements cited by the defendant are: (1) that he is a member of a protected group; (2) that an adverse employment action was taken against him; (3) that after his discharge, the position he held was filled by someone outside his protected class; and (4) that he was qualified for the position for which he was discharged and was performing the job at the level that met the employer's legitimate expectations. (Doc. 21 at 8 (citing, among others, *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998))).

forth is Mr. Spatola.  However, the plaintiff has failed to show that he and Mr. Spatola were similarly situated in any respect.  The defendant, however, additionally notes that Rossi and Spatola were similarly situated in at least one respect - - they are both Italian.  (Doc. 24 at 7 (citing Bumbalough Aff. at ¶ 4)).  The plaintiff has not offered anything to refute the defendant's assertion.  Therefore, Spatola cannot be a comparator as he is not outside the plaintiff's protected class.  Without Spatola, the plaintiff has failed to offer any comparators.  As such, he cannot establish a *prima facie* case.

Even had the plaintiff established a *prima facie* case, he would not be able to get past summary judgment because he cannot show that the defendant's proffered legitimate, nondiscriminatory reason for his termination is pretext for unlawful discrimination.  Once the defendant has articulated its legitimate reason for the plaintiff's termination, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538 (citing *Cooper-Houston v. Southern Ry. Co*., 37 F.3d 603, 605 (11th Cir. 1994)).  This must include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs*, 106 F.3d at 1538.  If it is "determine[d] that a reasonable jury could conclude that the employer's" articulated reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the

19

employer's explanations for its action." *Id.*

In evaluating whether the plaintiff has demonstrated pretext, the court must examine each of the proffered "legitimate reasons" for the employment decision and determine whether the plaintiff has cast sufficient doubt on each to permit a reasonable fact finder to conclude that the purported "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538-39. *See Mora v. University of Miami*, 15 F. Supp. 2d 1324, 1336 (S.D. Fla. 1998)(A plaintiff, nevertheless, can survive summary judgment by presenting evidence demonstrating a genuine issue of material fact as to the truth or falsity of each of the employer's legitimate, nondiscriminatory reasons), *citing Evans v. McClain of Georgia, Inc*., 131 F.3d 964-65 (11th Cir. 1997) (citing *Combs*, 106 F.3d at 1530-32).

In the instant case, Best Buy premises its termination of the plaintiff on his fourth violation of Best Buy's personnel policies in four months - - using the manager's override code to clock out. (Doc. 21 at 10). Although the plaintiff alleges that he was justified in the conduct recorded on the PCRs, he does not deny that he engaged in the misconduct. *See Standard v. A.B.E.L. Servs., Ins.*, 161 F.3d at 1333 ("Standard cannot show that the reasons listed on the worksheets are pretextual when he admits their truth. . . ."). Additionally, the plaintiff cannot rest on his claim that his misconduct did not justify discharge. *See e.g. Combs*, 106 F.3d at 1543 ("Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer."). The court finds that the plaintiff's subjective belief that his performance was satisfactory and that his misconduct was justified is insufficient to overcome the defendant's proffered legitimate reason for his

20

termination.  The plaintiff's discrimination claim is, therefore, due to be dismissed.[22]

---

[22]As additional evidence of pretext, the plaintiff offers the following:

Best Buy implemented a disciplinary process that called for a verbal warning for an employee's first infraction of a company policy or procedure.  If the employee violated the same policy or procedure within 90 days, the employee would then be given a written warning.  If the employee violated the same policy or procedure again within 90 days, the employee would be given a final warning.  If the employee violated the same policy or procedure again within 90 days, the manager would contact human resources at which time the employee may be terminated.

As Mr. Bumbalough testified, if the employee violated a different company policy or procedure, the employee would be given a verbal warning regardless of the existence of other violations.  Furthermore, the employee's record would be cleared after 90 days if no other similar violations occurred.

Mr. Bumbalough testified that each of the four occurrences cited by the Defendant in support of Mr. Rossi's termination were, in his judgment, violations of different policies and procedures so that they should not have had a cumulative effect in leading to Mr. Rossi's termination.  Furthermore, at least one of the purported violations would have, according to Mr. Bumbalough, been cleared from Mr. Rossi's file having occurred more than 90 days from the date of his termination.  However, even thought [sic] Mr. Bumbalough admitted that Mr. Rossi was not trying to steal from the company, the normal disciplinary process outlined above was not used and Mr. Rossi was immediately terminated.

(Doc. 23 at 21-22).  The court notes, however, that the plaintiff's interpretation of Bumbalough's testimony is wholly inaccurate.  Specifically, Bumbalough testified as follows:

Q.  During the management integration program, did they talk to you about if you felt like you needed to discipline an employee, what steps you would take . . . ?

A.  Yes.  However, it was not if you do this, this happens type of situation.  It was the steps you would take in order to basically change a behavior.  However, it didn't say that this step or this infraction other than an integrity issue of theft would equal this write-up.

Q.  Okay.  Other than integrity issues, what were the steps that you were taught to take when you wanted to discipline an employee, say, for example, you know, if you felt like you had to discipline an employee for something other than an integrity issue?  What were you taught is the first step to take?

A.  Verbal warning.

Q.  When someone was given a verbal warning because of some behavior, was anything put in their employee file?

A.  Not always, but yes.

Q.  Can you give me examples of conduct where a verbal warning was given where nothing was put in the employee's file?

. . .

A.  I had a person drop and break a DVD player . . .

. . .

Q.  And . . . examples of conduct where you would give an employee a verbal warning where you would have put something in their file?

A.  If someone broke one of the rules such as something that went against what we call our

21

standard operating platform, which is the rules of engagement . . .

(Bumbalough Dep. at 31-32).  Neither party submitted the remainder of this colloquy to the court.  Instead, the next pertinent portion of testimony skips fourteen pages forward to the following colloquy:

Q . . . . After an employee is given a verbal warning, what is the next step in the disciplinary process at Best Buy?

A.  It would be a written warning.

Q.  . . . .

A.  If I can continue, unless it was deemed otherwise by your human resource manager because anytime that you write someone up, you want to get the right thing to do.  You want to find advice or get the information form your human resource manager.

If it is something that would deal with an issue that would be deemed as maybe an integrity issue or something deemed as questionable, you would definitely call you human resource manager to get the proper behavior . . . .

Q. Other than integrity issues, which I think we separated out, we talked about verbal warnings and we weren't dealing with integrity issues and I think we were focusing on maybe violations of the SOP . . . if a written warning was given for something like that, again violating some SOP that wasn't an integrity issue, would you contact HR under those circumstances?

A.  I'm not understanding you.  I don't know what your thought of integrity is.  I don't know what your definition really is.

My personal definition of integrity would be knowing a rule and doing something different than what it says knowingly.  That is an integrity issue on my behalf.  It is not just loss or stealing.  It is knowing I'm not supposed to do this and doing it any way [sic], so I consider that an integrity issue maybe to clear that up a little bit.

. . . .

A.  If it involved a safety issue, a security issue, or a potential loss for the company, then I would probably call the human resource manager for that.  If it was something that was going to be less than that, I would probably handle that in the store myself.

. . . .

A.  That is a real hard question to answer because of the level of things that could happen in a store.

. . . .

Q.  Again, to make sure I understand, an employee violates some policy.  You give them a verbal warning; correct, the first time?

A.  It depends on the policy, but yes.

Q. Other than integrity issues . . . and again I understand about your definition of integrity, but just a standard violation by an employee, no big deal, the first step is a verbal warning?

A.  Correct.

Q.  Okay.  And the next step is a written warning; correct?

22

A.  Correct.

Q,  To get to the next step of giving an employee a written warning, is it necessary that it be the same rule that was violated by the employee or is it any kind of conduct?

A.  It needs to be in my vision needs to be like conduct but not limited to that because if you look at the way performance counseling records are laid out, it is either you broke a rule or a regulation of Best Buy's[,] which is pretty broad[,] or you acted under misconduct.  It is just pretty broad.  If it is the same type of thing, yes.  If it is a misconduct piece, depending on what realm of misconduct it is in, yes.  You would continue up the same ladder.  I'll give you an example.

. . .

A.  If you were late . . . and we wrote you up for being . . . late and you didn't call in, then we put that as a written or informal. We talk about it.  You drop something and break it on accident [sic], then that . . . would be a different infraction.. . .

Q. . . . If an employee was late and didn't call in, the first time they would be given a verbal warning?

A.  Yes.

Q.  And then let's say the next week . . . , they didn't handle the merchandise properly and they broke something.  I think if I understand what you are saying since it is not really the same as being late, you would basically give them another verbal warning?

A.  Correct.

Q.  And then let's say the next week someone doesn't follow proper loading dock procedure, but nothing too serious, then since it is not like the other two times, you would give them another verbal warning?

A.  If it were outside that realm, yes; but what you just described to me would be within the same as the second one.  It is processes and procedures, so yes the second or the third scenario that you gave me would actually go to a written. . . .

Q.  So then let's focus on the first example of someone being late.  The first time they are late without calling in, a verbal warning which may or may not be put in the file.  The next week they are late again without calling, that would be a written warning placed in their file?

A.  Could be, yes.

Q.  Is there a time when it wouldn't be?

A.  If it were outside 90 days, yes.

. . . .

A.  If you get written up, it stays in your file for 90 days.

Q.  Or if you are given a verbal warning?

A.  Yes.

Q . . . they were given a verbal warning and 90 days passes and then they are late again.  Let's say 95 days have passed.  At that point, would they receive a verbal warning or be written up?

23

**B.      Retaliation**

As stated by the United States Supreme Court:

> Under Title VII of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."

*Clark County School Dist. v. Breeden*, 532 U.S. 268, 269, 121 S. Ct. 1508, 1509, 109 L . Ed. 2d 509 (2001).  The plaintiff alleges that he was terminated as a result of the complaints he made to Kelly Arnold in Best Buy's human resources department.  The defendant contends, instead, that he was terminated for misconduct.

The appropriate framework from which to evaluate the plaintiff's retaliation claim is the same *McDonnell Douglas* standard used in the discriminatory discharge analysis in the foregoing

---

A.  A verbal warning.

Q.  Would that 90-day rule apply to written warnings as well?

A.  Yes.

Q.  All right.  Let's continue using the example of begin late to work.  A person is late to work the first time, a verbal warning.  Late to work a second time, written warning.  Late a third time, what happens?

A.  . . . .  If it was all cut and dry . . . and there was no other circumstances that would change that thought process, it would go to a verbal warning, written warning, final warning.

Q.  And again, someone is late for work within 90 days after they received a final warning . . . what would be the next step in he disciplinary process?

A.  The manager would call the human resource manager and explain the situation.  The human resource manager would then dictate what steps to be taken, and in normal circumstances under that process the person would be terminated.

(Bumbalough Dep. at 46-57).  Nowhere in the deposition testimony provided to the court did Bumbalough testify that "each of the four occurrences cited by the defendant in support of Mr. Rossi's termination were, in his judgment, violations of different policies and procedures so that they should not have had a cumulative effect in leading to Mr. Rossi's termination;" or that "at least one of the purported violations would have been cleared from Mr. Rossi's file having occurred more than 90 days from the date of his termination" as the plaintiff represents.  Instead, Bumbalough answered a series of questions about a hypothetical situation that was not akin to Rossi's case.

section.  The plaintiff has the initial "burden of establishing a prima facie case." *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. at 1824.  "If a plaintiff establishes a prima facie case of [retaliation], the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Chambers v. Walt Disney World, Co.*, 132 F. Supp. 2d 1356, 1365 (M.D. Fla. 2001) (quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)).  Once the defendant has articulated its legitimate, nondiscriminatory reason or reasons for the plaintiff's termination, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538 (citing *Cooper-Houston*, 37 F.3d at 605).  This must include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538.  If it is "determine[d] that a reasonable jury could conclude that the employer's articulated reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." *(Id.*).

To establish a prima facie case of retaliation, the plaintiff  must prove three elements: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998), *cert. denied,*

525 U.S. 1000, 119 S. Ct. 509, 142 L. Ed. 2d 422 (1998).[23]

The plaintiff engaged in the protected activity of complaining to human resources that his manager made jokes and comments about his national origin.  He suffered an adverse employment action when he was terminated shortly thereafter.  The defendant contests the third prong -- whether a causal connection exists between the protected activity and the termination. (Doc. 21 at 16).  It asserts once again that the plaintiff was terminated as a result of his excessive misconduct and continued poor work performance.  (*Id*.).

In support of these contentions, the defendant presents the PCRs the plaintiff received as a result of his misconduct as well as affidavit testimony of the decisionmaker in the case.  The plaintiff disputes the defendant's assertions.

United States District Judge Robert B. Propst addressed the issue of what constitutes a causal relationship in the retaliation context in *Taylor v. Renfro Corp.*, 84 F. Supp. 2d 1248 (N.D. Ala. 2000).  He stated:

> The Eleventh Circuit "interpret[s] 'the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'"  *Meeks v. Computer Assoc. International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Reichhold*, 988 F.2d at 1564).  The Eleventh Circuit also does "not construe the 'causal link' . . . to be the sort of logical connection that would justify a prescription that the protected

---

[23]In the instant case, the defendant asserts that because the plaintiff did not complain about any particular adverse action, his complaint must have been an alleged hostile work environment.  (Doc. 21 at 14).  However, the defendant further argues that the plaintiff could not have held a good-faith, objective belief that he was being subjected to a hostile work environment.

Specifically, the defendant argues that the comments Rossi complains of were not severe or pervasive enough to constitute a hostile work environment and that this case does not involve evidence of extensive, long-lasting, unredressed, and uninhibited harassment; but instead, Rossi's allegations were "isolated incidences" of "simple offhand teasing" or "mere utterances."  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998).  In sum, the defendant argues, while the alleged comments may have been insensitive, they were not of the sort contemplated by Title VII's prohibition of national origin discrimination.  (Doc. 21 at 14-15).

However, the court finds that the adverse action the plaintiff received was the subsequent termination.  The adverse action prong of the test does not relate to the subject of the plaintiff's complaint, but the treatment the plaintiff receives subsequent to making the protected speech.

[activity] in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).  And while not a per se requirement, courts do consider the amount of time lapsed between the time of the complaint and the time of the adverse employment action.  *See Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1556 (11th Cir. 1995); *Maniccia v. Brown*, 171 F.3d 1364, 1369-70 (11th Cir. 1999).

A causal link has been found sufficient to withstand a defendant's motion for summary judgement, for example, where an employer discovered an employee's EEOC charge and a series of adverse employment actions commenced almost immediately, *Wideman*, 141 F.3d at 1457; where a supervisor was displeased with a HEW investigation and associated the employee who suffered adverse employment action with the investigation, *Simmons*, 757 F.2d at 1189; and where a plaintiff complained of sexual harassment in June, 1995, was terminated in April, 1997, and the plaintiff's performance evaluations for her 18 years of employment had been favorable, *Mortenson*, 54 F. Supp. 2d at 1124-25.

A causal link has not been found, for example, where the plaintiff failed a test and passing the test was necessary for being offered the job at issue, *Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997); where the adverse employment action occurred 15 and 21 months, respectively, after the plaintiff filed a grievance against her employer, *Maniccia*, 171 F.3d at 1370 ("The only causal connection established by the evidence is between Appellant's misconduct and her termination."); where the plaintiff failed to complete necessary management tasks, had a poor working relationship, and refused to accept constructive criticism, *Coutu*, 47 F.3d at 1074-75; where the time lapse between plaintiff's complaint and her termination was 16 months, *Aldridge*, 847 F. Supp. at 486; and where plaintiff's complaint was thoroughly investigated, a detailed report was filed concerning the investigation, the subject of the complaint was sanctioned, strenuous efforts were made to put plaintiff into another position within the company, and plaintiff was ultimately terminated six months after her complaint was filed, *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir. 1997).

In this case, plaintiff was terminated approximately four months after her last formal complaint regarding Richardson's conduct.  The ensuing investigation consisted of Todd asking Richardson and Ingle what had happened (but did not include asking plaintiff what had happened), and cautioning Richardson and Ingle to not say things which might be misinterpreted by other employees.  She was terminated for recounting socks in violation of company policy.  She admitted to recounting socks, but claimed it was inadvertent. Viewing the situation in the light most favorable to the plaintiff, she made three "formal" complaints, and she

allegedly made numerous "informal" complaints up to January of 1997, one month prior to her termination. Her work record prior to February 21, 1997, had been unblemished. Richardson characterized her as a very good worker. [ ] Richardson was also aware that Taylor had complained to Bennett about his conduct. [ ] She was terminated on her first mistake, despite the fact that she admitted the error and gave an explanation for it. Based on this, it does not appear that the employment action and plaintiff's complaints were wholly unrelated. Thus, plaintiff has satisfied the third prong.

*Taylor*, 84 F. Supp. 2d at 1259-60 (footnotes omitted).

After reviewing *Taylor* and the discussion therein, the court finds that the inquiry necessary to determine whether the requisite relationship has been established is very case specific. No one aspect of the consideration is necessarily determinative. Under the present facts, the court finds that the causal relationship between the plaintiff's complaint and his termination is not sufficiently established to defeat the defendant's motion. First, unlike the plaintiff in *Taylor*, Rossi did not have an "unblemished" two year work record. (*Id*. at 1249, 1260). Instead, he had four incidences of misconduct within a four month period. Second, Casey was not only not the decisionmaker, but the record demonstrates that he did not play a role in the decision to terminate the plaintiff. In fact, as best this court can reasonably conclude premised on the record before it, Casey did not even know the plaintiff had been terminated until several days after his termination. (Williams' Aff. at ¶¶ 7-8).

In light of the foregoing, the court finds that the plaintiff's termination was a result of his misconduct and not causally related to his complaints of national origin discrimination. As such, the plaintiff cannot establish a prima facie case of retaliation. Therefore, the defendant's motion for summary judgment on the plaintiff's retaliation claim is due to be granted.

Even if the court had found that the plaintiff established a *prima facie* case of retaliation, the next step would have been to determine whether the defendant articulated a legitimate,

28

nondiscriminatory reason for his termination.  As previously stated, the defendant asserts that the plaintiff was terminated because of his misconduct.  Although the plaintiff rationalizes the basis for his misconduct that resulted in the PCRs, he does not dispute that he engaged in the misconduct as set out in the PCRs.  The plaintiff's subjective opinion as to whether his misconduct was justified is irrelevant.

Because the defendant has articulated a legitimate, non-discriminatory reason for the plaintiff's termination, the plaintiff must demonstrate that the proffered reason is pretextual.  If the plaintiff fails to offer evidence showing that each of the defendant's proffered reasons are pretextual, then summary judgment is mandatory.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc).  Accordingly, the court, must "determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct."  *Combs*, 106 F.3d at 1538.

The court does not find that "the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action[s] that a reasonable fact finder could find them unworthy of credence.'"  *Combs*, 106 F.3d at 1538.  As just noted, the plaintiff does not dispute that he engaged in the conduct in question.  As such, even if the court had found that he presented a *prima facie* case of retaliation, it would have further found that he failed to establish that the defendant's legitimate business reason for his termination was pretext for discrimination.  As such, the plaintiff's claim of retaliation is due to be dismissed.

29

**IV.     CONCLUSION**

Upon consideration, the court finds that the defendant's motion for summary judgment (doc. 20) is due to be granted.  An order consistent with this court's findings will be entered.

The Clerk of the Court is **DIRECTED** to serve a copy of this memorandum opinion upon counsel of record.

**DONE**, this 30th day of December, 2004.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge